995 F.2d 457
 Dennis WILEY, as next of friend, parent, and guardian of
Trilby Wiley; Dennis Wiley; Elaine Wiley, his
wife, Appellants,
v.
STATE FARM FIRE & CASUALTY CO.; Floyd Wiley, Jr.
 No. 92-3137.
 United States Court of Appeals,
Third Circuit.
 Submitted Jan. 11, 1993.
Decided June 3, 1993.
 
 Richard A. Damiani, Richard A. Damiani & Associates, Cleveland, OH, for appellants.
 S. Asher Winikoff, Jones, Gregg, Creehan & Gerace, Pittsburgh, PA, for appellee, State Farm Fire & Cas. Co.
 Before HUTCHINSON, SCIRICA, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 In this diversity case, we are called upon to predict whether Pennsylvania law would obligate an insurer under its homeowner's insurance policy to provide coverage for damages incurred by an insured in the sexual molestation of his minor niece. Prior to the commencement of the present action, the insured, Floyd Wiley, Jr. (Floyd), pled guilty in 1988 in a state court of Pennsylvania to one count of indecent assault and one count of corrupting the morals of a minor.
 
 
 2
 The plaintiffs, Dennis and Elaine Wiley, as parents and next of friend of the minor (the Wileys), citizens of Ohio, then filed the instant civil suit against Floyd, a citizen of Pennsylvania, in the United States District Court for the Western District of Pennsylvania to recover money damages for bodily harm resulting from their daughter's molestation in 1986. The complaint alleged negligent infliction of personal injury, as well as intentional tort.
 
 
 3
 Floyd tendered defense of the civil action to State Farm Fire and Casualty Co. (State Farm) under the homeowner's policy it issued to him. State Farm accepted the defense subject to a reservation of rights to contest coverage on the ground that Floyd's conduct fell within a standard homeowner's policy coverage exclusion for bodily injury "intended or expected" by an insured (the intended harm exclusion).[1] The proper construction of this clause is at the heart of the insurer's defense and is the sole issue on appeal. The parties eventually stipulated to Floyd's culpability, the value of the Wileys' claim should they prevail, and the filing of a declaratory judgment action against State Farm to determine the applicability of the homeowner's policy to the Wileys' claim. Upon the filing of the declaratory judgment action, the plaintiffs dismissed the suit against Floyd.
 
 
 4
 Both parties filed motions for summary judgment. The district court denied the Wileys' motion and entered judgment granting State Farm's motion. The Wileys timely appealed. We affirm.
 
 I. BACKGROUND
 
 5
 In July 1986, Floyd sexually molested his minor niece, then age 13, while she was a visitor at his home. It was undisputed for purposes of summary judgment that Floyd, an admitted alcoholic at the time of these incidents of sexual misconduct, was intoxicated during these episodes. Although the district court found no Pennsylvania law directly on point, it determined that courts in other jurisdictions infer an intent to harm as a matter of law from acts of child molestation and rape, which intent precludes insurance coverage. It also found that other courts consider the sexual molestation of children to be a criminal offense for which public policy precludes a claim that no harm was intended. For these reasons, the court predicted that the Pennsylvania Supreme Court would hold Floyd's sexual abuse of the minor excluded from coverage under his homeowner's policy with State Farm. Wiley v. State Farm Fire & Cas. Co., No. 89-421, slip op. at 2-4, 1992 WL 503433 (W.D.Pa. Feb. 24, 1992).
 
 
 6
 On appeal, the Wileys contend that the district court erred (1) in granting State Farm's motion for summary judgment because a genuine issue of material fact exists as to the intent of the insured at the time of the incidents, and (2) in finding that Pennsylvania public policy insulates the insurer from liability to victims of sexual molestation when the insured's actions are found to be criminal, regardless of the actual existence or non-existence of an intent to harm.
 
 II. DISCUSSION
 
 7
 On appeal, the Wileys initially contend that the district court erred in granting State Farm's motion for summary judgment because a genuine issue of material fact exists as to Floyd's intent at the time of the incidents in question. To respond to this contention, we must first determine whether the Pennsylvania Supreme Court would adopt and apply the inferred intent rule when an insured asserts that he or she subjectively intended no harm to his or her victim. We must then consider whether that court would also apply the rule when an insured asserts a lack of capacity to form an intent to harm.
 
 A. STANDARD OF REVIEW
 
 8
 We review the district court's prediction of state law under a plenary standard. Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am., 724 F.2d 369, 371 (3d Cir.1983). Federal courts sitting in diversity "are required to apply the substantive law of the state whose laws govern the action." Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir.1990) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). We must therefore turn to the substantive law of Pennsylvania to evaluate the propriety of the district court's grant of summary judgment in this case.[2]
 
 
 9
 The Pennsylvania Supreme Court, however, has not spoken on the issues raised in this appeal. Therefore, we must predict how the state court would resolve these issues should it be called upon to do so. Id. Although our review of the district court's prediction of Pennsylvania law is plenary, in discharging our function we take into consideration the district judge's prediction of the law of the state in which he or she sits. Compagnie des Bauxites, 724 F.2d at 371. We also examine:
 
 
 10
 (1) what the Pennsylvania Supreme Court has said in related areas;
 
 
 11
 (2) the "decisional law" of the Pennsylvania intermediate courts;(3) federal appeals and district court cases interpreting the state law;
 
 
 12
 (4) decisions from other jurisdictions that have discussed the issue we face here.
 
 
 13
 Gruber v. Owens-Illinois Inc., 899 F.2d 1366, 1369-70 (3d Cir.1990).
 
 
 14
 B. APPLICABILITY OF THE INFERRED INTENT RULE WHEN THE
 
 
 15
 INSURED ASSERTS AN ABSENCE OF SUBJECTIVE INTENT TO HARM
 
 
 16
 The inferred intent rule allows a court to infer an actor's intent from the nature and character of his or her acts. See, e.g., Fireman's Fund Ins. Co. v. Hill, 314 N.W.2d 834, 835 (Minn.1982). Courts applying the inferred intent rule generally do so to establish conclusively the existence of intent to harm as a matter of law. See, e.g., State Farm Fire & Cas. Co. v. Abraio, 874 F.2d 619, 623 (9th Cir.1989) (applying California law) ("there is an irrebuttable presumption of intent to harm supplied as a matter of law in child molestation cases").[3] Once established, this conclusive presumption of intent to harm results in a determination as a matter of law that, notwithstanding the insured's assertion of an absence of subjective intent to harm, an insurer has no obligation under a policy containing a standard intended harm exclusion to provide coverage for bodily injury to a child sexually abused by an insured adult. Id. at 623; see also Horace Mann Ins. Co. v. Leeber, 180 W.Va. 375, 376 S.E.2d 581, 585 (1988); Horace Mann Ins. Co. v. Independent Sch. Dist. No. 656, 355 N.W.2d 413, 417 (Minn.1984).
 
 
 17
 In adjudicating general liability insurance cases, as opposed to those exceptional cases involving sexual child abuse, Pennsylvania courts presently follow the intermediate appellate court decision of United Services Automobile Association v. Elitzky, 358 Pa.Super. 362, 517 A.2d 982 (1986), appeal denied, 515 Pa. 600, 528 A.2d 957 (1987). Applying well-settled standards of insurance contract interpretation, the Elitzky, court first determined that, as used in the standard intended harm exclusion, "intentional and expected are synonymous." 517 A.2d at 986, 991. The court then stated:
 
 
 18
 We hold that an intended harm exclusionary clause in an insurance contract is ambiguous as a matter of law and must be construed against the insurer. We hold that such a clause excludes only injury and damage of the same general type which the insured intended to cause. An insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result.
 
 
 19
 Id. at 989.
 
 
 20
 In Pennsylvania, then, it is not sufficient that the insured intended his actions; rather, for the resulting injury to be excluded from coverage, the insured must have specifically intended to cause harm. Id. at 987; Eisenman v. Hornberger, 438 Pa. 46, 264 A.2d 673, 674-75 (1970). Additionally, in cases that do not involve sexual child abuse, Pennsylvania has adopted a general standard for determining the existence of this specific intent that looks to the insured's actual subjective intent. See Eisenman, 264 A.2d at 675 ("There is no basis on which to conclude that that [sic] the insured in this case intended to cause any property damage [while burglarizing plaintiffs' home]."); Elitzky, 517 A.2d at 987, 989 (stating standard in terms of desires and knowledge of insured and specifically rejecting objective standard by stating "[t]he exclusion is inapplicable even if the insured should reasonably have foreseen the injury which his actions caused").
 
 
 21
 In the context of general liability insurance cases, this subjective standard is not uncommon. See, e.g., Continental W. Ins. Co. v. Toal, 309 Minn. 169, 244 N.W.2d 121, 124-25 (1976) (intended harm exclusion inapplicable unless insured acts with intent to cause bodily injury). As the district court noted in this case, however, Pennsylvania has not decided the appropriate standard for determining the existence of an insured's intent to harm in the specific context of liability insurance cases involving intentional acts of child molestation. In this particular context, Elitzky's subjective standard for determining intent to harm is considered the minority rule. See Whitt v. DeLeu, 707 F.Supp. 1011, 1015 & n. 7 (W.D.Wis.1989) (discussing cases adopting subjective test as taking minority approach).
 
 
 22
 If the Pennsylvania Supreme Court would apply this minority rule in the case of an insured's sexual child abuse, Floyd's assertion that he subjectively intended no harm, standing alone, would raise a genuine issue of triable fact as to Floyd's mental state at the time he sexually abused his niece. The court's grant of summary judgment rejecting any obligation on State Farm's part to provide coverage for the minor's bodily harm would then have been error.[4] If, however, the Pennsylvania Supreme Court would adopt and apply the inferred intent rule in the exceptional case of sexual child abuse by an insured adult, as the district court predicted it would, then the district court did not err in granting summary judgment.
 
 
 23
 Although no federal appeals court has previously attempted to interpret Pennsylvania law in the specific context of sexual child abuse by an insured adult who claims to have had no subjective intent to harm the abused child, the district court in the instant case is not the first court to have predicted the Pennsylvania Supreme Court's adoption of the inferred intent rule. In Foremost Insurance Co. v. Weetman, 726 F.Supp. 618, 621-22 (W.D.Pa.1989), aff'd without op., 904 F.2d 694 (3d Cir.1990), the court predicted Pennsylvania's adoption and application of the inferred intent rule after determining that "[a] majority of the courts have held that in liability insurance cases involving sexual abuse of children, the intent to cause injury can be inferred as a matter of law." 726 F.Supp. at 620. The court noted further that "there is an apparent shift in minority jurisdictions toward the majority view." Id. at 621.
 
 
 24
 The Weetman court correctly observed that the majority of jurisdictions to have considered the question of which standard to use in cases of an insured's sexual abuse of a child had adopted the inferred intent rule. This has remained true over the intervening years, even as the number of courts to have faced the question has increased;[5] further, the trend noted in Weetman for minority jurisdictions to convert to the majority approach continues to grow.[6]
 
 
 25
 As a result, although the Pennsylvania courts have been silent on this matter, we benefit from the experience of many other jurisdictions that have struggled with this problem. As background, the court in Allstate Insurance Co. v. Roelfs, 698 F.Supp. 815 (D. Alaska 1987) (predicting Alaska law), perceptively observed that generally "courts have developed three different approaches for determining whether the insured intended to cause injury and thus whether the exclusion applies to a particular case." Roelfs, 698 F.Supp. at 819. The court explained:
 
 
 26
 Some courts have held that the exclusion does not apply unless the insured subjectively intended to cause some injury. Courts adopting this approach will rarely decide the coverage question on a motion for summary judgment since the subjective intent of the insured is generally a question of fact. Other courts have used an objective test for determining the intent of the insured. These courts will apply the exclusion so long as an ordinary, reasonable person would expect or intend injury to result from the particular act committed, or, alternatively stated, if the natural and ordinary consequences of the act are bodily harm. Finally, a third group of courts, led by the state courts of Minnesota, have [sic] ruled that in sexual assault and molestation cases the intent to cause injury will be inferred from the act as a matter of law. These courts hold that the exclusion applies "if a reason for the insured's act is to inflict bodily injury [subjective test] or 'when the character of the act is such that an intention to inflict injury can be inferred' as a matter of law."
 
 
 27
 Id. at 819-20 (emphasis added) (citations and footnotes omitted); see also Allstate Ins. Co. v. Troelstrup, 789 P.2d 415, 418-19 & n. 9 (Colo.1990); Western Nat'l Assurance Co. v. Hecker, 43 Wash.App. 816, 719 P.2d 954, 959-60 (1986).
 
 
 28
 Many courts have discussed the circumstances under which it may be appropriate to infer intent to harm from the character of the act committed. In discussing the inferred intent rule generally, the court in K.A.G. v. Stanford noted its narrow applicability by first setting forth two threshold requirements: The conduct must be intentional and it must be substantially certain to cause injury. K.A.G. v. Stanford, 148 Wis.2d 158, 434 N.W.2d 790, 792, (Ct.App.1988), review denied, --- Wis.2d ----, 439 N.W.2d 142 (1989), and approved in N.N. v. Moraine Mut. Ins. Co., 153 Wis.2d 84, 450 N.W.2d 445, 448 (1990). Where these conditions are met,
 
 
 29
 the rule will only be applied if the degree of certainty that the conduct will cause injury is sufficiently great to justify inferring intent to injure as a matter of law.
 
 
 30
 . . . . .
 
 
 31
 [T]he more likely harm is to result from certain intentional conduct, the more likely intent to harm may be inferred as a matter of law.
 
 
 32
 Id. 434 N.W.2d at 792-93. The court finally specified that "[a]cts of sexual molestation against a minor are so certain to result in injury to that minor that the law will infer an intent to injure on behalf of the actor without regard to his or her claimed intent." Id. at 793.
 
 
 33
 In Whitt, the court stated:[Courts following the majority approach] have found that the alleged sexual contact [between an insured adult and a minor] is so substantially certain to result in some injury, or so inherently injurious, "that the act ... precludes a claim of unintended consequences, that is, a claim that no harm was intended to result from the act." ... Leeber, 376 S.E.2d at 585.
 
 
 34
 707 F.Supp. at 1014-15.
 
 
 35
 The Court of Appeals of New York recently considered the precise question we have here in Allstate Insurance Co. v. Mugavero, 79 N.Y.2d 153, 581 N.Y.S.2d 142, 589 N.E.2d 365 (1992). In Mugavero, the insured sexually abused two children under the age of 10, and he and his wife demanded that their homeowner's insurance carrier afford them a defense and indemnify them for whatever damages may be recovered. The decisive question there, as here, was whether the damages fell within the policy exclusion for injuries "intentionally caused by an insured person." Mugavero, 581 N.Y.S.2d at 144, 589 N.E.2d at 367. In reversing the intermediate appellate court and the trial court, the court of appeals framed the critical question as "whether the harm that resulted to [the] children from the sexual assault allegedly committed on them ... could have been other than harm 'intentionally caused' within the meaning of the policy exclusion." Id. 581 N.Y.S.2d at 145, 589 N.E.2d at 368.
 
 
 36
 The Mugavero court accepted the insurer's argument that "in the exceptional case of an act of child molestation, cause and effect cannot be separated; that to do the act is necessarily to do the harm which is its consequence; and that since unquestionably the act is intended, so also is the harm." Id. 581 N.Y.S.2d at 146, 589 N.E.2d at 369. The court stated, "We think the argument finds support in logic and in the generally accepted conception of harm as being inherent in the act of sexually abusing a child." Id.; see also Troy v. Allstate Ins. Co., 789 F.Supp. 1134, 1136 (D.Kans.1992) (predicting Kansas law); Weetman, 726 F.Supp. at 622; Whitt, 707 F.Supp. at 1016; K.A.G., 434 N.W.2d at 793; Roe v. State Farm Fire & Cas. Co., 188 Ga.App. 368, 373 S.E.2d 23, 25 (1988), aff'd, 259 Ga. 42, 376 S.E.2d 876 (1989). The court, after exhaustively researching the severe emotional and psychological damage that results from acts of sexual child abuse, regardless of the motivation for or nature of such acts,[7] held that harm to the children inhered in the very nature of the acts alleged and "that whatever injuries resulted were, as a matter of law, 'intentionally caused' within the meaning of the policy exclusion." Id.
 
 
 37
 California courts have collapsed the act and the harm into one. In J.C. Penney Casualty Insurance Co. v. M.K., 52 Cal.3d 1009, 278 Cal.Rptr. 64, 804 P.2d 689 (1991), the court stated:
 
 
 38
 There is no such thing as negligent or even reckless sexual molestation. The very essence of child molestation is the gratification of sexual desire. The act is the harm. There cannot be one without the other. Thus, the intent to molest is, by itself, the same as the intent to harm.
 
 
 39
 M.K., 278 Cal.Rptr. at 70, 804 P.2d at 695. Finally, Colorado has concisely described the action of courts adopting the inferred intent rule by stating that "[i]n effect, these courts have taken judicial notice that some harm inevitably results from sexual assaults on children." Troelstrup, 789 P.2d at 419.
 
 
 40
 To summarize our survey of these and other analogous cases, we acknowledge that the overwhelming majority of courts considering the issue of an insurer's obligation to provide coverage for damages caused by an insured adult's intentional sexual abuse of a child have concluded that the insured's intent to harm will be inferred as a matter of law despite the insured's assertion that he or she subjectively did not intend to harm the child. These courts have so held regardless of whether the sexual abuse was "nonviolent" or unaccompanied by penetration, see, e.g., Whitt, 707 F.Supp. at 1013 (no violence); American Family Mut. Ins. Co. v. Purdy, 483 N.W.2d 197, 197, 201 (S.D.1992) (no penetration); or whether it took place over a long or short period of time, see, e.g., CNA Ins. Co. v. McGinnis, 282 Ark. 90, 666 S.W.2d 689 (1984) (almost daily abuse for ten years); Fire Ins. Exchange v. Abbott, 204 Cal.App.3d 1012, 251 Cal.Rptr. 620 (1988) (single, brief incident). They have so held despite the result of denying the victim another source of compensation, see, e.g., Leeber, 376 S.E.2d at 585; and without displacing a subjective or objective intent standard in other categories of liability insurance cases, see, e.g., Horace Mann Ins. Co. v. Fore, 785 F.Supp. 947 at 949-56 (M.D.Ala.1992); Roelfs, 698 F.Supp. at 820 n. 5-6.
 
 
 41
 Further, the majority courts have supported their adoption of the inferred intent rule by noting that the state's proscription of sexual contact between an adult and a minor is a clear indication that such contact is inherently injurious to the victim, State Farm Fire & Cas. Co. v. Smith, 907 F.2d 900, 902 (9th Cir.1990) (predicting Nevada law); M.K., 278 Cal.Rptr. at 64, 804 P.2d at 689; Troelstrup, 789 P.2d at 419; Landis v. Allstate Ins. Co., 546 So.2d 1051, 1053 (Fla.1989); that criminalization of such conduct additionally serves to place the insured on notice of "the societal understanding that the harm from such conduct is inseparable from its performance," Mugavero, 581 N.Y.S.2d at 146, 589 N.E.2d at 369; that the harm to the victimized child is no less serious when the abusive adult's subjective intentions are purportedly "benign," id.; and that, as a matter of insurance contract interpretation based on the expectations of the parties to the contract, "[t]he average person purchasing homeowner's insurance would cringe at the very suggestion that he was paying for [coverage for liability arising out of his sexual abuse of a child]. And certainly he would not want to share that type of risk with other homeowner's policy holders." Rodriguez by Brennan v. Williams, 42 Wash.App. 633, 713 P.2d 135, 137-38 aff'd en banc, 107 Wash.2d 381, 729 P.2d 627 (1986); see also Mugavero, 581 N.Y.S.2d at 147, 589 N.E.2d at 370; Leeber, 376 S.E.2d at 586.
 
 
 42
 Finally, the minority approach has been criticized as "logically untenable," Hecker, 719 P.2d at 960, with one court noting that "a completely subjective test would virtually make 'it impossible to preclude coverage for intentional [injuries] absent admissions by insureds of specific intent to harm or injure. Human nature augurs against any viable expectation of such admissions.' " Leeber, 376 S.E.2d at 586 (alteration in original) (citation omitted). Assertions by insured adults that they did not intend the harm resulting from their intentional sexual misconduct with minors have been described as "def[ying] logic," Landis, 546 So.2d at 1053; "little short of absurd," Mutual of Enumclaw v. Merrill, 102 Or.App. 408, 794 P.2d 818, 820 (1990); and "fl[ying] in the face of all reason, common sense and experience," McGinnis, 666 S.W.2d at 691.
 
 
 43
 In surveying out-of-state authority on this issue, the Supreme Court of California distilled the majority courts' view:
 
 
 44
 [O]ther courts have relied in large part on a realistic view of child molestation. The view was well put by a Florida justice: "... I am absolutely unwilling to deny the foreseeability of injury to a child who is subjected to sexual abuse. It defies human response and sensitivity to conclude that the inevitable product of the sexual molestation of a child is not intended. That conduct inescapably inspires some response in the minor victim. Whether the response is a precocious excitation of libido, an utter revulsion or simply confusion, the child suffers grave psychological injury.... The damage [the child in this case] suffered flowed just a surely from [the insured's] criminal acts as if he had taken his fist or a club and struck her in the face."
 
 
 45
 M.K., 278 Cal.Rptr. at 74-75, 804 P.2d at 699-700 (quoting Zordan v. Page, 500 So.2d 608, 613 (Fla.Dist.Ct.App.1986) (Frank, J., dissenting), overruled by Landis, 546 So.2d 1051).
 
 
 46
 We believe a rule holding that harm to children in sexual molestation cases is inherent in the very act of sexual assault committed on a child, regardless of the motivation for or nature of such assault, and that the resulting injuries are, as a matter of law, intentional represents an enlightened and perceptive view of the evolving law. We therefore predict that the Pennsylvania Supreme Court, if called upon to decide the issue, would adopt the inferred intent rule in liability insurance cases involving an insured adult's intentional sexual abuse of a child to raise a conclusive presumption of the insured's intent to harm the victim, regardless of the insured's assertion of a subjective lack of intent to harm.
 
 
 47
 C. APPLICABILITY OF THE INFERRED INTENT RULE WHEN THE
 
 
 48
 INSURED ASSERTS AN INCAPACITY TO FORM AN INTENT TO HARM
 
 
 49
 Although a majority of courts have adopted and applied the inferred intent rule in cases where the insured merely asserts a subjective intent not to harm the minor victim of his or her sexual abuse, see supra section II.B., a different and more subtle issue is raised when the insured asserts an incapacity to form the requisite intent.[8] There are fewer cases addressing this legal and factual twist, both in the context of general liability insurance cases and in the exceptional context of sexual child abuse cases, and the courts' responses to this issue have been mixed.
 
 
 50
 Court treatment of the issue has evolved along three basic lines:
 
 
 51
 1. Some courts look first to the nature and character of the act committed. They reason that if the nature and character of the act are such that an intent to harm may be inferred, as in cases involving the insured's acts of sexual child abuse, then any question of the inability to form the intent to harm, whether it arises out of alleged mental disease or defect or voluntary intoxication, is immaterial in resolving the insurer's obligation to provide coverage. The insured's subjective intent to harm in such context is wholly irrelevant. Public Employees Mut. Ins. Co. v. Rash, 48 Wash.App. 701, 740 P.2d 370, 373 (1987);[9] see also Landis, 546 So.2d at 1053; State Farm Fire & Cas. Co. v. Estate of Jenner, 874 F.2d 604, 605, 607 (9th Cir.1989) (relying on Abbott, 251 Cal.Rptr. 620, and Abraio, 874 F.2d 619, to grant summary judgment to insurer after vacation of original opinion erroneously predicting that credible evidence of diminished capacity which precluded insured from forming intent could prevent a finding of intent in cases of child molestation); Hecker, 719 P.2d 954 (insured's asserted inability to formulate intent based on his drinking and marijuana smoking did not preclude inference of intent to harm); N.N., 450 N.W.2d 445 (where insured earlier pled guilty to charge of sexual molestation of minor, defense of diminished capacity to formulate intent due to intoxication was inapplicable to prevent inference of intent to harm in subsequent liability insurance case).
 
 
 52
 2. Some courts hold that, as a matter of law, an insured may never assert a lack of capacity to form intent caused by voluntary intoxication as a defense to the application of an intended harm exclusion, regardless of the act committed. These courts essentially reason that evidence establishing that the insured was under the influence of intoxicants "is of no consequence, for the law must not permit the use of such stimuli to become a defense for one's actions." Hanover Ins. Co. v. Newcomer, 585 S.W.2d 285, 289 (Mo.Ct.App.1979); Allstate Ins. Co. v. Hampton, 173 Mich.App. 65, 433 N.W.2d 334 (1988) (sexual child abuse case) (relying on Allstate Ins. Co. v. Sherrill, 566 F.Supp. 1286, 1288 (E.D.Mich.1983) ("public policy demands that a voluntary departure of one's good judgment and rational decision-making abilities [due to ingestion of hallucinogenic drugs and alcohol] should not permit the insured to abrogate his financial responsibility to those he brutally injures")).[10]
 
 
 53
 3. Other courts maintain, however, that where an incapacity to form intent to harm is alleged, that incapacity may render unintentional any harm caused by the insured so that such an incapacity must be considered by a factfinder when resolving the issue of the existence of intent to harm. See, e.g., Globe Am. Cas. Co. v. Lyons, 131 Ariz. 337, 641 P.2d 251 (Ct.App.1981) ("derangement of intellect"); Parkinson v. Farmers Ins. Co., 122 Ariz. 343, 594 P.2d 1039 (Ct.App.1979) (intoxication). In instances where application of the inferred intent rule might otherwise be proper, this factual inquiry in effect supersedes scrutiny of the nature and character of the act committed and renders application of the inferred intent rule inappropriate. See, e.g., Worchester Ins. Co. v. Fells Acres Day Sch., Inc., 408 Mass. 393, 558 N.E.2d 958, 965 (1990) (sexual child abuse case), further explained in Hanover Ins. Co. v. Talhouni, 413 Mass. 781, 604 N.E.2d 689 (1992).
 
 
 54
 The second approach outlined above, which rejects consideration of voluntary intoxication in all liability insurance cases, is inapplicable under existing Pennsylvania precedent because the Pennsylvania intermediate court has already announced that intoxication is indeed to be considered in general liability insurance cases when resolving the issue of subjective intent. Stidham v. Millvale Sportsmen's Club, 421 Pa.Super. 548, 618 A.2d 945, 952 (1992). However, the Pennsylvania courts have not spoken on the need to consider intoxication in the exceptional context of sexual child abuse cases. We are therefore left to determine which of the other approaches referred to above Pennsylvania would adopt.
 
 
 55
 The District Court for the Western District of Pennsylvania has decided a case involving the insurer's obligation under Pennsylvania law when an insured adult sexually abuses a child and then claims an inability to form the intent to harm that is required for application of the intended harm exclusion. In State Farm Fire & Casualty Co. v. Christopher, 729 F.Supp. 446 (W.D.Pa.1988), the insured claimed his advanced multiple sclerosis had interfered with his ability to formulate the necessary intent to harm his victims. The court made no specific analysis of the sexual context of the case and applied the law from Elitzky. The court held that the parties' disagreement over the existence of the insured's subjective intent to harm raised a genuine issue of material fact precluding a grant of summary judgment for either party. Id. at 448-49.[11]
 
 
 56
 As mentioned above, the Pennsylvania Superior Court has recently discussed Pennsylvania's law of intent in the context of general liability insurance cases interpreting the intended harm exclusion. Stidham, 421 Pa.Super. 548, 618 A.2d 945. In Stidham, the insured became voluntarily intoxicated and suffered an alcoholic blackout. In this condition, he shot and killed the victim, a man he had never met and to whom he had never spoken. In discussing the insurer's obligation to defend and indemnify its insured under a homeowner's policy in a civil suit brought by the victim's estate, the superior court stated:
 
 
 57
 For purposes of the insurance policy provision excluding coverage for expected or intended injuries by the insured, "an insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result." United Serv. Auto. Ass'n v. Elitzky, [358 Pa.Super. 362], 517 A.2d 982, 989 (Pa.Super.1986), appeal denied, [515 Pa. 600], 528 A.2d 957 (Pa.1987). Moreover, imbibed intoxicants must be considered in determining if the actor has the ability to formulate an intent. Nationwide Mut. Ins. Co. v. Hassinger, [325 Pa.Super. 484], 473 A.2d 171, 176 (Pa.Super.1984).
 
 618 A.2d at 953.[12]
 
 58
 The court in Stidham rendered its opinion after the district court decision in the instant case. However, we do not believe that the district court would have been bound in this case by Stidham's admonition that intoxication must be considered in determining the existence of intent under an intended harm exclusion any more than it was bound earlier by Elitzky in applying a subjective standard to the intent question. Both Stidham and Elitzky are general liability insurance cases in which there was no determination that the nature and character of the insured's acts were such that his intent to harm could be inferred. We interpret Stidham's enunciated rule on voluntary intoxication to be a specific manifestation of Elitzky's subjective intent standard, i.e., where a subjective standard is applicable to the intent question, then voluntary intoxication, if alleged, must be considered in the resolution of that issue. The Stidham rule, however, does not extend beyond general liability insurance cases to mandate application of the third approach outlined above.
 
 
 59
 The first approach offers the better rule because in exceptional cases such as sexual child abuse, where the insured's conduct is both intentional and of such a nature and character that harm inheres in it, that conduct affords a sufficiently clear demonstration of intent to harm subsuming any need for a separate inquiry into capacity. Once it is determined, strictly by examining the nature and character of the act in question, that it is appropriate to apply the inferred intent rule, then the actor's actual subjective intent to harm or capacity to form that intent becomes irrelevant. Roelfs, 698 F.Supp. at 820-21 nn. 6-7; Troelstrup, 789 P.2d at 419; Merrill, 794 P.2d at 820; Abraio, 874 F.2d at 623 (relying on Abbott, 251 Cal.Rptr. 620). At that point, it does not matter whether a subjective intent existed or why it did or did not exist. Rash, 740 P.2d at 373. Once subjective intent is deemed irrelevant, an actor who is unable to form the intent to harm is indistinguishable from one who could have formed the intent but claims he or she did not.
 
 
 60
 We therefore predict that the Pennsylvania Supreme Court, if called upon to decide the issue, would apply the inferred intent rule in liability insurance cases involving sexual child abuse where the insured asserts an incapacity of any sort to form an intent to harm.[13]
 
 III. CONCLUSION
 
 61
 Our review of a grant of summary judgment is plenary. Carlson v. Arnot-Ogden Memorial Hosp., 918 F.2d 411, 413 (3d Cir.1990). On review, we apply the same test the district court should have utilized initially: We will therefore affirm the grant of summary judgment only if there are no genuine issues of material fact and the relevant law entitles State Farm to judgment. Shiffler v. Equitable Life Assurance Soc'y of U.S., 838 F.2d 78, 83 (3d Cir.1988); Fed.R.Civ.P. 56(c). In the present case, the parties do not dispute the intentional nature of Floyd's conduct; rather, they dispute the existence of his intent to harm. For purposes of this review, we take as true Floyd's assertions as a matter of fact that he did not subjectively intend to harm the minor child and that he was incapable of forming the necessary intent to harm because of his intoxication and chronic alcoholism. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976) ("The non-movant's allegations must be taken as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt."), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Under the law relevant to sexual child abuse, however, Floyd's actual subjective intent is not an element of State Farm's defense; it therefore is not material to the outcome of this case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.")
 
 
 62
 In affirming the district court's prediction that the Pennsylvania Supreme Court would adopt and apply the inferred intent rule to the present case, we accept the court's implicit ruling that Floyd intended harm to the minor as a matter of law. "Where the intent to injure is inferred as a matter of law from the nature of the acts committed, the subjective ... intent of the insured to cause injury is irrelevant." Roelfs, 698 F.Supp. at 820-21 nn. 6-7; see also Troelstrup, 789 P.2d at 419; Merrill, 794 P.2d at 820; Abraio, 874 F.2d at 623 (relying on Abbott, 251 Cal.Rptr. 620). Therefore, Floyd's assertions concerning his lack of subjective intent to harm, even to the extent they are grounded in an alleged inability to formulate such intent, are irrelevant to the matter at hand and do not create a genuine issue of material fact precluding summary judgment in favor of State Farm. Rash, 740 P.2d at 373 ("If in sex abuse cases the subjective intent of the insured is irrelevant, it follows logically that it is likewise irrelevant if the insured is incapable of forming the intent to injure").
 
 
 63
 Having established the existence of the intended harm exclusion in Floyd's homeowner's policy and Floyd's intent to harm his minor niece as a matter of law through application of the inferred intent rule, State Farm merits judgment as a matter of law; it is under no obligation to provide coverage for bodily harm caused by Floyd's sexual abuse of the minor. Fore, 785 F.Supp. at 956 ("Where, as here, intent to injure can be inferred as a matter of law, summary judgment [in favor of the insurer] is proper if the policy excludes coverage for intended injuries.").
 
 
 64
 Accordingly, the judgment of the district court will be affirmed.[14]
 
 
 
 [1]
 The policy provided in pertinent part, in Section II, Coverage L, for the payment of a claim against an insured for damages because of bodily injury or property damage to which coverage applies and for which the insured is legally liable. Section II, Coverage M, provided for the payment of necessary medical expenses incurred or medically ascertained as a result of an accident causing bodily injury. The exclusions provision of Section II, however, provided:
 
 
 [1]
 Coverage L and Coverage M do not apply to:
 a. bodily injury or property damage which is expected or intended by an insured....
 One court has pointed out that it is preferable to consider the issue of initial coverage before addressing the issue of exclusion. Western Nat'l Assurance Co. v. Hecker, 43 Wash.App. 816, 719 P.2d 954, 958 n. 2 (1986). The issue of initial coverage is not raised by the parties to this appeal, however, and we therefore do not address it.
 
 
 [2]
 The United States District Court for the Western District of Pennsylvania had jurisdiction pursuant to 28 U.S.C. §§ 1332 and 2201 (West 1993). This court exercises jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 1993). The parties to the present case do not dispute the district court's application of Pennsylvania substantive law, and we therefore apply it on appeal
 
 
 [3]
 Two courts have suggested that the presumption is rebuttable under circumstances where the actor's capacity to form an intent to harm has been put at issue. Sena v. Travelers Ins. Co., 801 F.Supp. 471, 475 (D.N.M.1992) (inferring intent, but noting that "there is no suggestion here, as in some cases, that [the insured] was incapable of forming intent"); Roe v. State Farm Fire & Cas. Co., 259 Ga. 42, 376 S.E.2d 876, 877 (1989) (holding "intentional child molestation carries with it a presumption of intent to inflict injury," but suggesting that the presumption may be rebuttable under "the strongest of factual situations"). Another court simply refuses to apply the inferred intent rule under these circumstances, Hanover Ins. Co. v. Talhouni, 413 Mass. 781, 604 N.E.2d 689 (1992); when it does apply the rule, however, that application appears to raise a conclusive presumption. Worchester Ins. Co. v. Fells Acres Day Sch., Inc., 408 Mass. 393, 558 N.E.2d 958, 965 (1990). The propriety of inferring intent where the capacity to formulate it is at issue is discussed fully, infra, in section II.C
 
 
 [4]
 Floyd's guilty pleas to charges of indecent assault and corrupting the morals of a minor do not appear to collaterally estop him from disputing intent because intent is not an element of either charge under Pennsylvania law. Commonwealth v. Seiders, 531 Pa. 592, 614 A.2d 689, 690-91 (1992)
 
 
 [5]
 With the decision in Weetman, courts in the following seventeen states had adopted the majority approach: Alaska (federal diversity prediction), Arkansas, California, Colorado, Florida, Georgia, Iowa, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, Oklahoma (federal diversity prediction), Pennsylvania (federal diversity prediction), Washington, West Virginia, and Wisconsin. See Allstate Ins. Co. v. Roelfs, 698 F.Supp. 815 (D.Alaska 1987); Whitt, 707 F.Supp. at 1014 & n. 4 (cases collected); Weetman, 726 F.Supp. at 618
 Since then, courts in the following seventeen states have also adopted the majority approach: Alabama, Arizona, Delaware, Kansas (federal diversity prediction), Kentucky, Illinois, Indiana, Maine, Montana, Nebraska, Nevada (federal diversity prediction), New Jersey, New Mexico (federal diversity prediction), New York, Ohio, Oregon, and South Dakota. See State Farm Fire & Cas. Co. v. Davis, 612 So.2d 458, 463, 464 (Ala.1993) (cases collected); Thompson v. West Am. Ins. Co., 839 S.W.2d 579 (Ky.Ct.App.1992); Sena, 801 F.Supp. 471; Young v. All Am. Ins. Co., 81 Ohio App.3d 493, 611 N.E.2d 421 (1992); see also Mid-Century Ins. Co. v. L.D.G., 835 S.W.2d 436, 438-44 (Mo.Ct.App.1992) (Hanna, J., concurring).
 
 
 [6]
 At the time or soon after Weetman was decided, several jurisdictions either had minority precedent, or competing minority and majority precedent. Since then, 1) the Colorado Supreme Court reversed the court of appeals and adopted the majority rule, Allstate Ins. Co. v. Troelstrup, 789 P.2d 415 (Colo.1990), rev'g 768 P.2d 731 (Colo.Ct.App.1988); 2) the Florida Supreme Court affirmed the majority approach taken by one district court of appeals and overruled the minority approach taken by another, Landis v. Allstate Ins. Co., 546 So.2d 1051 (Fla.1989), aff'g 516 So.2d 305 (Fla.Dist.Ct.App.1988) and overruling Zordan v. Page, 500 So.2d 608 (Fla.Dist.Ct.App.1986); 3) the New York Court of Appeals reversed the supreme court, appellate division, and adopted the majority rule, Allstate Ins. Co. v. Mugavero, 79 N.Y.2d 153, 581 N.Y.S.2d 142, 589 N.E.2d 365 (1992), rev'g 166 A.D.2d 474, 561 N.Y.S.2d 35 (1990); and 4) in Davis, the Supreme Court of Alabama approved adoption of the majority approach as predicted by the United States District Court for the Middle District of Alabama in Horace Mann Ins. Co. v. Fore, 785 F.Supp. 947 (M.D.Ala.1992) and rejected adoption of the minority approach as predicted by the district court for the Northern District of Alabama in State Auto Mut. Ins. Co. v. McIntyre, 652 F.Supp. 1177 (N.D.Ala.1987). See also infra note 11 and accompanying text
 
 
 [7]
 See authorities collected in Mugavero, 581 N.Y.S.2d at 146, 589 N.E.2d at 369
 
 
 [8]
 The incapacity to form intent is often more specifically labelled a lack of or deficiency in mental capacity to form intent, whether due to mental disease or defect or voluntary intoxication by alcohol and/or drugs
 
 
 [9]
 We note that the Washington Court of Appeals, which decided Rash, has maintained in other liability insurance contexts that intoxication may negate the intent required by an intended harm clause. See, e.g., U.S.F. & G. Ins. Co. v. Brannan, 22 Wash.App. 341, 589 P.2d 817 (1979)
 
 
 [10]
 Some courts that have refused as matter of law to allow an insured's voluntary intoxication to prevent application of an intended harm exclusion in all liability insurance cases have suggested that incapacity caused by mental disease or defect may be treated differently. See, e.g., American Family Mut. Ins. Co. v. Peterson, 405 N.W.2d 418, 422 (Minn.1987)
 
 
 [11]
 At present, Christopher constitutes the only remaining, albeit beleaguered, authority for application of a subjective standard in liability insurance cases of an adult's sexual abuse of a child. In a carefully researched and drafted opinion, Weetman pointedly refused to follow Christopher, 726 F.Supp. at 622, and this court affirmed Weetman without opinion, 904 F.2d 694 (3d Cir.1990). However, that affirmance did not necessarily serve to overrule Christopher sub silentio because Christopher's issue of the insured adult's inability to formulate intent did not arise under the facts of Weetman
 
 
 [12]
 The court continued by saying, "If the actor does not have the ability to formulate an intent, the resulting act cannot be intentional." Stidham, 618 A.2d at 953 (citation omitted). At this point, the Stidham opinion ceases to distinguish carefully between the insured's intent to act and his intent to harm, and this statement seems to suggest that a question about the actor's ability to formulate intent goes directly to the issue of his intent to act, rather than his intent to harm. Insofar as K.A.G. and other authority make intentional conduct a requirement for inferring intent to harm, see Allstate Ins. Co. v. Thomas, 684 F.Supp. 1056, 1058; Fells Acres, 558 N.E.2d at 966; Merrill, 794 P.2d at 820; Abbott, 251 Cal.Rptr. at 630; Rash, 740 P.2d at 372, the Stidham court's statement would seem to prohibit such an inference in the present case; in fact, the court's statement, combined with Floyd's assertion regarding his inability to formulate intent, would seem to raise a genuine issue of material fact as to Floyd's intent to act
 The parties to the present case, however, do not dispute that Floyd's conduct was intentional; instead, they dispute the existence of his specific intent to harm, and matters relating to the existence of this specific intent are the only ones before this court.
 
 
 [13]
 Thus, we overrule whatever vitality may remain in State Farm Fire & Casualty Co. v. Christopher, 729 F.Supp. 446 (W.D.Pa.1988), after our affirmance of Weetman
 
 
 [14]
 Because we affirm based on the intended harm exclusion in Floyd's insurance contract, we do not address the question whether Pennsylvania public policy would also preclude insurance coverage under the facts of this case